**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MICHELLE O'CONNOR, on behalf of himself and a class of similarly situated persons,<br><br>Plaintiff,<br><br>vs.<br><br>ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>Defendant. | Case No. 26-cv-01635<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michelle O'Connor ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Allianz Life Insurance Company of North America ("Defendant") seeking monetary damages, restitution, and/or injunctive relief for the proposed Class and Subclasses, as defined below. Plaintiff makes the following allegations upon information and belief, the investigation of counsel, and personal knowledge or facts that are a matter of public record.

## I. INTRODUCTION

1. Plaintiff is among the roughly 1.4 million individuals in the United States impacted by a breach of their sensitive, personally identifiable information ("Personal Information") and protected health information ("PHI" and together with Personal Information, "Personal Information") stolen from a database operated by Defendant. This breach exposed Personal Information, including financial and medical data (the "Data Breach").

2. Starting on or around July 16, 2025, hackers successfully exploited a vulnerability in a Customer Relationship Management ("CRM") system that Defendant used as a hub to store and integrate customer, financial professional, and employee data with business systems.

3. Defendant's parent, Allianz SE ("Allianz"), had acknowledged the real risk of a data breach for years:

- 2015: "[C]yber risk is the risk most underestimated by businesses."[1] "Everyone is a target. Whatever their size or sphere of operation, all organizations need to consider their cyber exposures and prepare for a potential incident."[2]
- 2020: "In addition to being the top risk globally, Cyber incidents [are] among the top three risks in many of the countries surveyed; in Austria, Belgium, France, India, South Africa, South Korea, Spain, Sweden, Switzerland, the UK and the US it also ranks as the top business risk."[3]

---

[1] Allianz, *A Guide to Cyber Risk: Managing the Impact of Increasing Interconnectivity*, at 4 (Sept. 2015) (https://commercial.allianz.com/content/dam/onemarketing/commercial/commercial/reports/AGCS-Cyberrisk-report.pdf) (last accessed February 11, 2026).

[2] *Id.* at 13 (last accessed February 11, 2026).

[3] Allianz, Press Release, *Allianz Risk Barometer 2020: Cyber top peril for companies globally for the first time*, at 1 (2020) (https://www.allianz.com/content/dam/onemarketing/azcom/Allianz_com/press/document/Allianz-Risk-Barometer-2020-press-release_EN.pdf) (last accessed February 11, 2026).

- 2023: "Cyber incidents [are] the number one business risk for companies around the world, according to the Allianz Risk Barometer 2023, with data breaches the cyber exposure of most concern."[4]

4. This year, Allianz further admitted that the threat of cyber attacks is still the top risk for companies: "Cyber incidents such as ransomware attacks, data breaches, and IT disruptions, rank as the top global risk in the Allianz Risk Barometer—and by a higher margin than ever before."[5]

5. Despite this knowledge, Defendant gathered, collected, and failed to adequately protect this vast repository of Personal Information through its business operations. As an insurance company that provides a comprehensive range of insurance products and services to its clients, it obtained access to the data involved in millions of insurance contracts and claims, allowing it to aggregate substantial amounts of medical records and histories, financial records, and other sensitive information of more than a million individuals.

---

[4] Allianz, *Cyber: dealing with a data breach* (April 2023) (https://commercial.allianz.com/news-and-insights/expert-risk-articles/cyber-data-breach.html) (last accessed February 11, 2026).

[5] Allianz, *Allianz Risk Barometer 2025 – Global risk #1: Cyber incidents (38%)* (Jan. 2025) (https://commercial.allianz.com/news-and-insights/expert-risk-articles/allianz-risk-barometer-2025-cyber-incidents.html) (last accessed February 11, 2026).

> Allianz cares about your personal data. Our mission is to ensure the Allianz' privacy strategy and framework enable our businesses to maintain the trust of customers, employees and other stakeholders in our handling of personal data. We are committed to the highest standards of data protection and privacy compliance by handling personal data responsibly, transparently, with due care and in a fair and lawful manner. We use it only for specified and legitimate purposes and only keep it for as long as is needed. We never share it with anyone who is not authorized to access it.
>
> We strive to communicate honestly and openly about actions that involve the personal data we process. We integrate data protection into the design of our products (privacy by design) and take appropriate steps to protect personal data and keep it secure
>
> On this page, we would like to introduce you to our Privacy framework and activities.

6. While Defendant held the Personal Information of approximately 1.4 million Americans, it failed to use basic data security measures necessary to protect it. This is despite Defendant's explicit promises in its Privacy Statement:[6]

7. Beginning as early as July 16, 2025, hackers compromised Defendant's database and gained access to its systems. Defendant discovered the breach on July 17, 2025, one day after the breach occurred, but the press did not report it until July 26, 2025,[7] and Defendant did not personally notify its policyholders until August 1, 2025. Although

---

[6] Allianz, *Privacy Statement* (https://www.allianz.com/en/privacy-statement.html#:~:text=We%20are%20committed%20to%20the,as%20long%20as%20is%20needed) (last accessed February 11, 2026).

[7] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed February 11, 2026); Reuters, *Allianz Life says majority of US customers' data stolen in hack* (July 26, 2025) (https://www.reuters.com/technology/allianz-life-says-majority-us-customers-data-stolen-hack-2025-07-26/) (last accessed February 11, 2026).

many details of the Data Breach have not been publicly released, the nature of the breach illustrates Defendant's severe security deficiencies.

8. Allianz has instructed companies on how to take steps to protect against cyber attacks to which its own subsidiary, Defendant, turned a blind eye. Indeed, Allianz has stated that the breach was due to a "social engineering technique" that often involves a scheme to gain access.[8] Even though Allianz has stressed (at least as early as 2015) the ten steps a company should take to protect itself,[9] Defendant did not sufficiently secure its own system and/or ensure that any CRM system was properly vetted for cybersecurity.




---

[8] *Id.*

[9] Allianz, *A Guide to Cyber Risk: Managing the Impact of Increasing Interconnectivity*, at 14 (Sept. 2015) (https://commercial.allianz.com/content/dam/onemarketing/commercial/commercial/reports/AGCS-Cyberrisk-report.pdf) (last accessed February 11, 2026).

9. Upon information and belief, the Data Breach can be attributed to the ShinyHunters threat group—hackers known to be targeting Salesforce CRM customers in social engineering attacks and employing tactics that include impersonating IT support staff and requesting that employees accept a connection to Salesforce Data Loader.[10] Once this connection is made, the hackers are exfiltrating data from Salesforce and extorting the company.[11]

10. "In around 80% of ransomware incidents losses could have been avoided if the organizations had followed best practices," according to Michael Daum, Senior Cyber Underwriter at Alliance Global Cyber Security ("AGCS").[12] "Regular patching and two-factor authentication, as well as information security and awareness training, are essential to avoiding ransomware attacks, as well as just good cyber hygiene," according to Rishi Baviskar, Global Cyber Experts Leader, Risk Consulting, ACGS.[13] Marek Stanislawski, Global Security Cyber Underwriting Lead at AGCS, has stated, "If adhered to, best practices recommendations and underwriting criteria should reduce incidents of

---

[10] Emma Woollacott, *Everything we know about the Allianz Life data breach so far*, IT PRO (July 28, 2025) (https://www.itpro.com/security/data-breaches/everything-we-know-about-the-allianz-life-data-breach-so-far) (last accessed February 11, 2026).

[11] *Id.*

[12] Allianz, *Ransomware trends: Risks and Resilience*, at 16 (Oct. 2021) (https://commercial.allianz.com/content/dam/onemarketing/commercial/commercial/reports/agcs-ransomware-trends-risks-and-resilience.pdf) (last accessed February 11, 2026).

[13] *Id.*

ransomware attacks…. Numerous security gaps can be closed, often with simple measures."[14]

11. Although "clear communication is key" and consumers should receive "timely information" from things like regional and national press and social media,[15] Defendant did not announce the Data Breach until July 26, 2025,[16] nine days after Defendant had learned of the breach. During this period, cybercriminals were able to expose Plaintiff and Class Members' data to the public, unbeknownst to Plaintiff and Class Members. Indeed, Defendant did not mail notice of the breach to Plaintiff until August 1, 2025—sixteen days after the Data Breach.

12. Had Defendant employed basic, long-established, and recommended security tools, the Data Breach should have been easily thwarted. Defendant, however, did not employ best practices for data security.

13. Once in Defendant's network, the hackers successfully exfiltrated policyholders' Personal Information from Defendant's server. Despite its sensitivity, Defendant did not store the data sufficiently securely to prevent its theft.

---

[14] *Id.* at 18.

[15] Allianz, *Cyber: dealing with a data breach* (April 2023) (https://commercial.allianz.com/news-and-insights/expert-risk-articles/cyber-data-breach.html) (last accessed February 11, 2026).

[16] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed Sept. 8, 2025); Reuters, *Allianz Life says majority of US customers' data stolen in hack* (July 26, 2025) (https://www.reuters.com/technology/allianz-life-says-majority-us-customers-data-stolen-hack-2025-07-26/) (last accessed February 11, 2026).

14. Both before and after the Data Breach, Defendant repeatedly put its interests above those of the impacted policyholders, despite its duties to Plaintiff and Class Members to implement and maintain reasonable and adequate measures to secure, protect, and safeguard their Personal Information against unauthorized access and disclosure. Defendant breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff and Class Members from unauthorized access to and disclosure of the Personal Information they had entrusted to Defendant.

15. As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred and Plaintiff and Class Members' Personal Information was accessed by, and disclosed to, unauthorized third-party actors.

16. Plaintiff and Class Members have suffered extreme harm due to the Data Breach, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identities, names, and likenesses; (3) fraud and potential or actual identity theft from the potential or actual misuse of their stolen Personal Information; (4) diminution in the value of their Personal Information due to the loss of security, confidentiality, and privacy; (5) lost value of their Personal Information; (6) emotional and mental distress and anguish resulting from the access, theft, and potential or actual posting of their Personal Information; (7) lost time, effort, and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of their Personal Information.

17. Upon information and belief, Defendant breached its duties and obligations by failing in one or more of the following ways: (1) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) to design, implement, and maintain reasonable data retention policies; (3) to adequately train employees on data security; (4) to comply with industry-standard data security practices; (5) to warn Plaintiff and Class Members of Defendant's inadequate security practices; (6) to encrypt or adequately encrypt the Private Information; (7) to recognize or detect that its network had been compromised and accessed in a timely manner so it could mitigate the harm; (8) to utilize widely available software capable of detecting and preventing this type of attack; and (9) to otherwise secure its hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

18. Defendant understood that, in order to receive services, Plaintiff and Class Members were required to entrust their highly sensitive Personal Information to Defendant. Plaintiff and Class Members entrusted this information to Defendant with a reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

19. This action seeks to hold Defendant accountable for its inadequate security and the resulting Data Breach. Thus, Plaintiff, on their own behalf and on behalf of all similarly situated individuals whose Personal Information was stolen as a result of the Data Breach, bring this Complaint and the below common law tort and state statutory claims seeking monetary damages including declaratory, injunctive, equitable, and all other relief authorized by law.

## II. PARTIES

20. Plaintiff Michelle O'Connor is a citizen of Painesville, Ohio who maintains an annuity with Defendant. Upon information and belief, Allianz Received Plaintiff's Personal Information from Plaintiff in 2025 in connection with registering for her annuity. Plaintiff O'Connor provided Allianz with extensive and sensitive Personal Information at least including name, address, phone number, email address, and Social Security number ("SSN"). On or about July 16, 2025, Plaintiff's Personal Information was accessed and exfiltrated from Defendant's networks. Plaintiff is extremely careful about sharing her Personal Information and to her knowledge she has not transmitted unencrypted Personal Information over the internet or via any other source. The Data Breach has caused Plaintiff significant anxiety as she has experienced fraudulent charges on her credit accounts and has been notified that her Personal Information has been published on the Dark Web. Plaintiff spends several hours a week verifying that she is not incurring additional fraudulent charges on any of her accounts.

21. Defendant Allianz Life Insurance Company of North America is a stock insurance corporation with its principal place of business at 5701 Golden Hills Drive, Minneapolis, MN 55416.

## III. JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3)

there are Class Members who are diverse from Defendant, and (4) there are more than 100 Class Members.

23. This Court has personal jurisdiction over Defendant because at all relevant times, Defendant operated its principal place of business in this State and also because Defendant took actions in this State that gave rise to the Data Breach and, thus, to Plaintiff and Class Members' claims.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (2) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

25. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

## IV. FACTUAL BACKGROUND

26. Defendant advertises it is "a leading provider of annuities and life insurance" that is "dedicated to helping secure the future of [Defendant's] customers."[17] Defendant invites potential clients to "depend on [Defendant] for the long term" to "deliver dependable, long-term results," due to its "extensive capabilities that allow [Defendant] to monitor and control risk in real time."[18]

---

[17] *Why Allianz* (https://www.allianzlife.com/why-allianz) (last accessed February 11, 2026).

[18] *Id.*

27. Defendant Allianz Life is a subsidiary of Allianz SE, a global financial services group with more than 128 million customers, which makes it one of the largest companies, insurers, and asset managers in the world.[19]

28. Because insurance coverage requires would-be policyholders to provide their personal and financial history to the insurer, the data stored on Defendant's network includes substantially detailed Personal Information including full names, phone numbers, addresses, Social Security numbers, dates of birth, email addresses, medical histories, specific treatment information, and insurance records.

29. Defendant has kept and maintained the Personal Information it has collected from its policyholders, employees, and other financial professionals over years of providing its services and has aggregated and stored information in the server that would ultimately be accessed and exfiltrated by unauthorized users during the Data Breach.

30. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including through payments made by or on behalf of Plaintiff and Class Members.

31. Personal Information has never been more ubiquitous or more valuable. The global data analytics market was estimated at $69.54 billion in 2024 and is projected to reach $302.01 billion by 2030, growing at a Compound Annual Growth Rate ("CAGR") of 28.7%.[20]

---

[19] *Id.*

[20] *Data Analytics Market Summary,* Grand View Research (https://www.grandviewresearch.com/industry-analysis/data-analytics-market-

32. The global investment banking firm RBC Capital Markets estimates that 30% of the world's data is now being generated in the healthcare sector and that healthcare data alone will grow to a CAGR of 36% by 2025.[21] Between 2009 and 2019, U.S. hospital adoption of Electronic Health Record ("EHR") systems grew from 6.6% to 81.2%.[22] One healthcare data firm—IQVIA, a "leading global provider of advanced analytics, technology solutions, and clinical research services"[23] —reported revenue of $14.9 billion for 2023.[24]

33. This accumulation of data creates the opportunity for commercial exploitation. Commercial data analytic efforts and techniques have evolved simultaneously

report#:~:text=2024%20Market%20Size:%20USD%2069.54,predictive%20analytics%20in%20patient%20care) (last accessed February 11, 2026).

[21] *The Convergence of Healthcare and Technology,* RBC Capital Markets (https://www.rbccm.com/en/gib/healthcare/episode/the_healthcare_data_explosion#:~:text=Today%2C%20approximately%2030%25%20of%20the,%25%20faster%20than%20media%20%26%20entertainment) (last accessed February 11, 2026).

[22] John (Xuefeng) Jiang, Kangkang Qi, Ge Bai, Kevin Schulman, *Pre-pandemic assessment: a decade of progress in electronic health record adoption among U.S. hospitals*, PubMed Central (Oct. 21, 2023) (https://pmc.ncbi.nlm.nih.gov/articles/PMC10986221/#:~:text=Drawing%20on%20data%20from%20the,the%20rates%20for%20comprehensive%20EHR) (last accessed February 11, 2026).

[23] Wolters Kluwer, IQVIA (https://www.wolterskluwer.com/en/solutions/enablon/partners/iqvia#:~:text=IQVIA%20is%20a%20leading%20global,in%20more%20than%20100%20countries) (last accessed February 11, 2026).

[24] Joseph Keenan, *IQVIA revenues up 4% on the year amid concerns of slowing demand,* Fierce Biotech (Feb. 21, 2024) (https://www.fiercebiotech.com/cro/iqvia-revenues-4-year-amid-concerns-slowing-demand-4q-revs-35#:~:text=IQVIA's%20yearly%20revenue%20grew%20by,estimate%20by%20analysts%20of%20$2.82) (last accessed February 11, 2026).

to accommodate the volume, velocity, and variety of these innumerable individual health records.[25]

34. According to its Privacy Notice, Defendant collects Personal Information that specifically includes social security numbers, income, account balances, payment history, transaction history, and insurance claim history.[26]

| Reasons we can share your personal information | Does Allianz share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes –** For example: to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes –** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |

35. Defendant specifically indicates the purposes for which it obtains, collects, and stores Plaintiff and Class Members' Personal Information, including for everyday business purposes and for marketing individually and jointly with other financial companies:[27] Plaintiff and Class Members have no way to limit this sharing of data.[28]

36. By obtaining, collecting, and storing and Class Members' Personal Information, Defendant assumed legal and equitable duties, and knew full well that it was

---

[25] *See generally From Data to Discovery: The Big Data Revolution in Healthcare,* PeekMed Blog (Sept. 4, 2023) (https://blog.peekmed.com/big-data-in-healthcare#:~:text=Before%20delving%20into%20its%20applications,learning%20algorithms%20and%20data%20professionals) (last accessed February 11, 2026).

[26] Allianz Privacy Notice, at 1 (https://www.allianzlife.com/-/media/Files/Global/documents/2016/05/09/17/32/M40018.pdf) (last accessed Sept. 7, 2025).

[27] *Id*. at 1.

[28] *Id.* at 12.

responsible for protecting Plaintiff and Class Members' Personal Information from unauthorized disclosure.

37. In the Privacy Notice, Defendant warrants that "to protect your personal information from authorized access and use, we use security measures that comply with federal and state law," which include using "security controls, including encryption, firewalls, [and] advanced malware detection."[29]

38. Hence, prior to the Data Breach, Defendant recognized and acknowledged that its customers trust it to protect the confidentiality and privacy of their data. Defendant was, and is, responsible to all those who place their trust in it to maintain data security, including Plaintiff and Class Members. Defendant's President and CEO Jasmine Jirele has specifically stated: "As a leading provider of innovative financial products to help manage risk, we are dedicated to helping secure the future of our customers."[30]

39. Given its prior and current representations and experience handling highly sensitive Personally Identifiable Health Information and Protected Health Information, Defendant understood the need and requirements to protect policyholders' Personal Information and prioritize data security.

**A. A Data Breach Exposed Personal Information Held by Defendant**

40. Defendant has yet to provide information about the CRM system connected to the hack or the threat actor, but sources suspect that the attack can be attributed to the

---

[29] *Id.*

[30] *Why Allianz* (https://www.allianzlife.com/why-allianz) (last accessed February 11, 2026).

ShinyHunters threat group—hackers known to be targeting Salesforce CRM customers in social engineering attacks.[31]

41. In June 2025, Mandiant—a company offering cyber security services—warned that ShinyHunters had begun to target Salesforce CRM customers using tactics such as impersonating IT support staff and requesting that employees accept a connection to Salesforce Data Loader. Once this connection is made, the hackers then exfiltrate the data from Salesforce.[32]

42. On June 4, 2025, Google's Threat Intelligence Group ("GTIG") echoed Salesforce's own warnings when it reported that the cybercriminal organization UNC6240, a.k.a. ShinyHunters, was using a common and well-known social-engineering vishing technique to gain unauthorized access to systems and databases.[33] GTIG explained that ShinyHunters was "a financially motivated threat cluster that specializes in voice phishing (vishing) campaigns specifically designed to compromise organizations' Salesforce instances for large-scale data theft and subsequent extortion."[34] GTIG highlighted that it is

---

[31] Emma Woollacott, *Everything we know about the Allianz Life data breach so far*, IT PRO (July 28, 2025) (https://www.itpro.com/security/data-breaches/everything-we-know-about-the-allianz-life-data-breach-so-far) (last accessed February 11, 2026).

[32] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed February 11, 2026).

[33] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last visited February 11, 2026).

[34] *Id.*

now "essential for [Defendant] to configure and manage access, permissions, and user training according to best practices" to prevent such data security incidents.[35]

43. ShinyHunters has a history of conducting similar high-profile data breaches—including those against PowerSchool and SnowFlake, impacting Santander, Ticketmaster, AT&T, Advance Auto Parts, Neiman Marcus, and Cylance.[36]

44. Defendant knew it was permitting its employees to use a CRM and its internal network service to store and transmit valuable and highly sensitive Private Information. As a result, Defendant knew its systems would be attractive targets for cybercriminals.

45. Defendant also knew that a breach of its system, and exposure of the information therein, would result in the increased risk of identity theft and fraud against the individuals whose Personal Information was compromised.

46. Defendant knew or should have known that immediate action was necessary to mitigate the access and disclosure of the Personal Information entrusted to it. However, Defendant failed to do so and caused Plaintiff and Class Members' highly sensitive Personal Information to be exposed to the public.

47. The United States Department of Health and Human Services Office for Civil Rights established a "Breach Portal" to address the widespread issue of data breaches.

---

[35] *Id.*

[36] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed February 11, 2026).

48. Upon information and belief, Defendant became aware of the Data Breach as early as July 17, 2025, and then said nothing to the public for nine days, until July 26, 2025—over a weekend—when the press reported the story. Prior to that, Defendant sent notice only to certain government agencies,[37] and did not actually notify affected individuals until August 1, 2025.

49. The extent of Defendant's efforts to help Plaintiff and Class Members protect themselves is nominal: Defendant has offered to provide affected individuals only 24 months of credit monitoring and identity theft protection.[38]

50. The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's consumers especially vulnerable to identity theft, tax fraud, medical fraud, insurance fraud, credit fraud, bank fraud, and more.

---

[37] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed February 11, 2026); Reuters, *Allianz Life says majority of US customers' data stolen in hack* (July 26, 2025) (https://www.reuters.com/technology/allianz-life-says-majority-us-customers-data-stolen-hack-2025-07-26/) (last accessed February 11, 2026).

[38] Emma Woollacott, *Everything we know about the Allianz Life data breach so far*, IT PRO (July 28, 2025) (https://www.itpro.com/security/data-breaches/everything-we-know-about-the-allianz-life-data-breach-so-far) (last accessed February 11, 2026).

51. Personal Information is a valuable property right.[39] The value of Personal Information as a commodity is measurable.[40] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[41] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[42] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market" or the "dark web" for many years.

52. As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Personal Information, and other sensitive information directly on various Internet

---

[39] Marc Van Lieshout, *The Value of Personal Data*, at 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26-38 (May 2015) (https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data) (last accessed February 11, 2026) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible.").

[40] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014) (https://www.medscape.com/viewarticle/824192?form=fpf) (last accessed February 11, 2026).

[41] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, NO. 220, at 4 (Apr. 2, 2013) (https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en) (last accessed February 11, 2026).

[42] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data & Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018) (https://www.iab.com/news/2018-state-of-data-report/) (last accessed February 11, 2026).

websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

53. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[43]

54. Even if stolen Private Information does not include financial or payment card account information, it does not mean that there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained Private Information about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

55. Further, according to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals target "highly prized" medical records. "[T]he number of data

---

[43] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, at 29 (June 2007) (https://www.gao.gov/assets/270/262899.pdf) (last accessed February 11, 2026).

breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [Health and Human Service's] Office for Civil Rights (OCR)—an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[44]

**B. Defendant Knew It Was at High Risk for a Data Breach**

56. Beyond these statistics regarding the increasingly high incident rate of data breaches, Defendant knew that it was at high risk for being targeted by cybercriminals.

57. Defendant issued a report[45] and accompanying press release[46] in October 2024 in which it acknowledged that "[f]requency and value of large cyber insurance claims [are] up 14% and 17% year-on-year in the first half of 2024, with data and privacy breach-related elements present in two thirds of these losses."[47]

58. Indeed, Michael Daum—Global Head of Cyber Claims for Allianz Commercial—notes that a "rise in ransomware attacks including data exfiltration is a consequence of changing attacker tactics and the growing interdependencies between organizations sharing ever more volumes of personal records."[48] The press release further

---

[44] Steve Alder, *Why Do Criminals Target Medical Records*, The HIPAA Journal (Nov. 2, 2023) (https://www.hipaajournal.com/why-do-criminals-target-medical-records/) (last accessed February 11, 2026).

[45] Allianz, *Cyber security resilience 2024: Trends in data breach and privacy risk* (https://commercial.allianz.com/content/dam/onemarketing/commercial/commercial/reports/cyber-security-trends-2024.pdf) (last accessed February 11, 2026).

[46] *New data privacy trends help drive growth in frequency and severity of large cyber claims: Allianz* (Oct. 9, 2024) (https://commercial.allianz.com/news-and-insights/news/cyber-risk-trends-2024.html) (last accessed February 11, 2026).

[47] *Id.*

[48] *Id.*

notes that "many data breaches, including some of the largest mass data exfiltration cyber-attacks over the past 18 months, are the result of weak cyber security within organizations."[49]

59. Critically, Rishi Baviskar—Global Head of Cyber Risk Consulting for Allianz Commercial—is quoted as saying that "[e]arly detection and response capabilities are … key."[50]

60. Defendant's "Cyber security resilience 2024" Report specifically identifies data exfiltration as an increasingly common feature of cyber attacks, with the goal of stealing personal and commercial sensitive data, additionally noting that even backed-up data "is effectively lost as the attackers have a copy and will threaten to publish on the dark web." [51]

61. The Report notes that organizations are even more susceptible to data breaches as they become increasingly reliant on connected services that allow the exchange and share of data across entities, and that cyber criminals are now targeting these digital supply chains to exfiltrate personal data en masse.[52]

---

[49] *Id.*

[50] *Id.*

[51] Allianz, *Cyber security resilience 2024: Trends in data breach and privacy risk*, at 9 (https://commercial.allianz.com/content/dam/onemarketing/commercial/commercial/reports/cyber-security-trends-2024.pdf) (last accessed February 11, 2026).

[52] *Id.* at 19.

62. As evidenced by the Report, Defendant was acutely aware of the risk of breach and exfiltration of data, including Plaintiff and Class Members' highly sensitive Personal Information.

63. Even more poignantly, the Report contains an entire section titled "Cyber hygiene," dedicated to "[i]mproving data protection and privacy."[53]

64. This section of the Report identifies phishing and stolen and/or compromised credentials as the two most commonly exploited security vulnerabilities, closely followed by cloud misconfiguration.[54]

65. Defendant's Report describes various measures necessary for proper cyber security, including strong access controls, database segregation, backups, patching, and training.[55] Defendant also recommends data breach simulations, which can identify gaps and weaknesses in a company's cyber security, breach response, and crisis management.[56]

66. Finally, Defendant recognized the importance of limited data retention:[57]

> Data breach and privacy risks can be mitigated in large part by good data governance and housekeeping, explains **Marisa Anthony, Senior Complex Claims Analyst, Allianz Commercial.**
>
> *"Be mindful of what data you are collecting. Only collect and store personal data that is needed for business purposes, not what you think you need, and have a process in place to dispose of that data when you no longer need it. This is a simple measure companies – large and small – can take that is low cost and doable today,"* says **Anthony.**

---

[53] *Id.* at 24.

[54] *Id.* at 25.

[55] *Id.* at 26.

[56] *Id.*

[57] *Id.* at 27.

67. Despite having actual knowledge of both the high risk posed by a data breach and the steps necessary to prevent and mitigate damage stemming from a data breach, Defendant failed to secure its systems against the cyber attack and subsequent Data Breach.

### C. Defendant Failed to Implement Sufficient Cybersecurity Measures to Prevent a Data Breach

68. Defendant did not have adequate cybersecurity monitoring systems in place to prevent unauthorized access to its networks.

69. "Cybersecurity or process monitoring is continuously observing and analyzing your computer network or systems to prevent cyberattacks. The primary objective of monitoring in cybersecurity is to quickly identify signs of vulnerability and responding to potential security threats in real-time."[58]

70. Defendant should have noticed the Data Breach through proper endpoint and network monitoring and scanning.

71. The attackers exfiltrated a massive amount of Personal Information. Such actions should have only been possible by Defendant network administrators and should have required even those administrators to pass on additional security features. Such exfiltration activity should have been detected and should have raised numerous red flags to Defendant had it properly monitored its system.

72. Had Defendant implemented adequate cybersecurity monitoring, the Data Breach would have been prevented or would have been much smaller in scope.

---

[58] *Cyber Security Monitoring: Definition and Best Practices*, SentinelOne (Sept. 7, 2025) (https://www.sentinelone.com/cybersecurity-101/cybersecurity/cyber-security-monitoring/) (last accessed February 11, 2026).

73. Defendant should have employed IP whitelisting, "[o]ne of the simplest yet effective methods of safeguarding systems…. It is particularly beneficial for businesses that rely on remote access or have distributed teams but want to maintain strict security protocols…. IP whitelisting is a security practice that involves creating a list of trusted IP addresses granted access to a specific server, application, or network. By using IP whitelisting, only pre-approved IP addresses can interact with your system. By restricting access to a select group of devices based on their IP addresses, you can limit exposure to potential attacks and unauthorized access. The method effectively controls access to critical business systems, cloud infrastructure, and online services."[59]

74. The United States Department of Commerce has also produced guidance for application whitelisting via the National Institute of Standards and Technology ("NIST") Special Publication 800-167: *Guide to Application Whitelisting,* which provides specific guidance to companies on how to implement whitelisting, to prevent "installation and/or execution of any application that is not specifically authorized for use on a particular host. This mitigates multiple categories of threats, including malware and other unauthorized software."[60]

---

[59] Timothy Shim, *IP Whitelisting: The Beginner's Guide*, RapidSeedbox.com (June 20, 2025) (https://www.rapidseedbox.com/blog/ip-whitelisting) (last accessed February 11, 2026).

[60] Adam Sedgewick, Murugiah Souppaya, Karen Scarfone, *NIST Special Publication 800-167, Guide to Application Whitelisting*, at 2 (Oct. 2015) (https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-167.pdf) (last accessed February 11, 2026).

75. Defendant also failed to follow its own guidelines as to what to do in the aftermath of a data breach.

76. According to an article on Defendant's website titled "Cyber: dealing with a data breach," taking immediate action is the most important step in a robust response to a data breach. Defendant states that there is a "critical moment" for action—"perhaps only a few minutes or maybe an hour or two at most."[61] It is therefore essential that a trained response team prepares for critical scenarios and clearly understands their roles and responsibilities.

77. Defendant has not made public what steps, if any, it took after discovering the breach on July 17, 2025, besides notifying the FBI.[62]

78. Defendant lists clear communication as the next step in responding to a data breach: the "response team must oversee … a comprehensive communications plans that reaches all affected audiences."[63] Despite this, Defendant failed to communicate clearly with anyone after the Data Breach, including Plaintiff or Class Members.

---

[61] Allianz, *Cyber: dealing with a data breach* (April 2023) (https://commercial.allianz.com/news-and-insights/expert-risk-articles/cyber-data-breach.html) (last accessed February 11, 2026).

[62] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed Sept. 8, 2025); Reuters, *Allianz Life says majority of US customers' data stolen in hack* (July 26, 2025) (https://www.reuters.com/technology/allianz-life-says-majority-us-customers-data-stolen-hack-2025-07-26/) (last accessed February 11, 2026).

[63] Allianz, *Cyber: dealing with a data breach* (April 2023) (https://commercial.allianz.com/news-and-insights/expert-risk-articles/cyber-data-breach.html) (last accessed February 11, 2026).

79. Defendant discovered the breach on July 17, 2025, one day after the breach occurred. Defendant, however, did not announce the breach until July 26, 2025,[64] allowing for a nine-day period in which cybercriminals were able to expose Plaintiff and Class Members' data to the public, unbeknownst to Plaintiff and Class Members.

80. This means that from July 17 to July 26, 2025, Plaintiff and Class Members had no ability to guard against the misuse of their stolen Personal Information and were robbed of the opportunity to freeze their credit cards, set up credit monitoring, or change their credentials. Because of Defendant's failure to communicate with the affected individuals, Plaintiff and Class Members' injuries stemming from the Data Breach increased substantially in severity.

**D. The Personal Information May be Listed on the Dark Web**

81. It is likely or at least a real risk that Plaintiff and Class Members' information has been exposed or will be listed for sale on the "dark web."

82. The dark web is a part of the World Wide Web that is not accessible through traditional internet browsers. The term "dark web" is used to distinguish from the "clear web," the part of the World Wide Web that is readily accessible through traditional internet browsers. The dark web is accessed through The Onion Router ("Tor"), a privacy-focused

---

[64] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, Bleeping Computer (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed February 11, 2026); Reuters*, Allianz Life says majority of US customers' data stolen in hack* (July 26, 2025) (https://www.reuters.com/technology/allianz-life-says-majority-us-customers-data-stolen-hack-2025-07-26/) (last accessed February 11, 2026).

communication system designed to enable anonymous internet browsing. It achieves this by routing web traffic through multiple volunteer-operated servers (relays), encrypting data at each step to ensure that both the user's location and browsing activity are difficult to trace. Tor uses a technique called "onion routing," where data is encrypted in layers like an onion. Each relay in the network peels away a layer of encryption before passing the data to the next relay. This ensures that no single relay knows both the origin and destination of the data.

83. The dark web poses significant challenges to cyber security professionals and law enforcement agencies. The dark web is legal to access and operate, and it has some legitimate applications and sites. But its hidden nature and employment of multi-level encryption make detecting and monitoring illegal activity difficult. Unlike the clear web, dark web sites do not advertise their existence. The anonymity of the dark web has led to the creation of a number of markets and forums which traffic in illegal merchandise and content, including stolen Personal Information.[65]

84. Once stolen Personal Information is posted on the dark web, it will most likely be distributed to multiple different groups and individuals,[66] each of which can use that information for fraud and identity theft.

---

[65] *Crime and the Deep Web*, STEVENSON UNIV. (https://www.stevenson.edu/online/about-us/news/crime-deep-web/) (last accessed Sept. 9, 2025); *Defending Against Malicious Cyber Activity Originating from Tor*, CISA (Aug. 2, 2021) (https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-183a) (last accessed February 11, 2026).

[66] *The Dark Web and Cybercrime*, U.S. Dep't of Health and Human Servs. Cybersecurity Program, Office of Information Security, at 10 (July 23, 2020) (https://www.hhs.gov/sites/default/files/dark-web-and-cybercrime.pdf) (last accessed February 11, 2026).

85. This data lifecycle has also been confirmed with experiments. In 2015, researchers at BitGlass created a list of 1,568 phony names, Social Security numbers, credit card numbers, addresses, and phone numbers, rolled them in an Excel spreadsheet, and then "watermarked" it with their code that silently tracks any access to the file. The data was quickly spread across five continents: North America, Asia, Europe, Africa, and South America. In the end, 47 different parties downloaded the data. It was mainly downloaded by users in Nigeria, Russia, and Brazil, with the most activity coming from Nigeria and Russia. [67] This experiment demonstrated that data released on the dark web will quickly spread around the world.

### E. The Data Breach Caused Negative Impacts

86. Personal Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion.[68] $168.6 billion of this

---

[67] Kelly Jackson Higgins, *What Happens When Personal Information Hits the Dark Web*, Dark Reading (Apr. 7, 2015) (https://www.darkreading.com/cyberattacks-data-breaches/what-happens-when-personal-information-hits-the-dark-web) (last accessed February 11, 2026). *See also* Kristin Finklea, *Dark Web*, Congressional Research Service, at 10 (July 7, 2015) (https://nsarchive.gwu.edu/sites/default/files/documents/2696100/Document-8.pdf) (last accessed February 11, 2026); Pierluigi Paganini, *How Far Do Stolen Data Get in the Deep Web After a Breach?*, Security Affairs (Apr. 12, 2015) (https://securityaffairs.com/35902/cyber-crime/propagation-data-deep-web.html) (last accessed February 11, 2026).

[68] *Alphabet Inc. Annual Report (Form 10-K)*, SEC, at 29, 32 (Feb. 3, 2021) (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm) (last accessed February 11, 2026).

revenue derived from its Google business,[69] which is driven almost exclusively by leveraging the Personal Information it collects about users of its various free products and services.

87. Criminal law also recognizes the value of Personal Information and the serious nature of the theft of Personal Information by imposing prison sentences. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Personal Information. Once a cybercriminal has unlawfully acquired Personal Information, the criminal can demand a ransom or blackmail payment for its destruction, use the Personal Information to commit fraud or identity theft, or sell the Personal Information to other cybercriminals on the black market.

88. The GAO released a report as far back as 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[70] This has not changed over the nearly two decades since this study.

89. The report explains, "The term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name."[71]

---

[69] *Id.* at 33.

[70] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, at 2 (June 2007) (https://www.gao.gov/assets/270/262899.pdf) (last accessed February 11, 2026).

[71] *Id.*

90. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. § 603.2(b).

91. Identity thieves use personal information for a variety of crimes. According to Experian, with access to an individual's Personal Information, criminals can do more than just empty a victim's bank account. They can also commit all other manner of fraud, including using the victim's personal information to obtain government benefits, to file a fraudulent tax return to obtain a large refund, to get medications or medical procedures, or to transfer home titles and then take mortgages against the victim's home. In addition, identity thieves may take over a victim's social media accounts and blackmail the person by threatening to share personal or embarrassing information or pictures with the victim's contacts. [72]

---

[72] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (Apr. 8, 2025), (https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/) (last accessed February 11, 2026).

92. Identity theft presents many challenges. In a survey, the Identity Theft Resource Center ("ITRC") found that 76% of victims of identity crimes who had reached out to the ITRC for assistance needed more than a month to resolve issues stemming from identity theft, and 48% of those victims still had not resolved their issues after a year.[73]

93. Theft of Social Security numbers creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the victim experiences the harm. Theft of Social Security numbers in combination with other Personally Identifiable Information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity due to their sensitive nature.

94. Beyond monetary losses and healthcare fraud, data breaches also have a deep, psychological impact on their victims:

> *In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you and prolong or worsen a cyber attack.*[74]

95. Plaintiff and Class Members have suffered substantial injury, including:

---

[73] *Consumer Impact – Business Impact Report,* ITRC, at 26 (Oct. 2024), (https://www.idtheftcenter.org/wp-content/uploads/2024/10/ITRC2024ConsumerandBusinessImpactReport.pdf) (last accessed February 11, 2026).

[74] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), (https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks) (last accessed February 11, 2026).

a. Loss of benefit of their bargain, for individuals who provided compensation to entities to safely transfer and store their data with Defendant or Defendant's vendors;

b. Loss of value of their personal information, in that it has been misused for purposes to which they did not consent, and they have not been properly compensated for this misuse;

c. Actual or attempted fraud, misuse, or identity theft caused by the Data Breach, including, but not limited to, their information being published to the clear, deep, and dark web; as well as

d. Time and expenses that were reasonably spent to mitigate the impact of the breach, including the cost of credit monitoring.

96. Plaintiff and Class Members have already experienced actual or attempted fraud, which is reasonably related to the Data Breach, and which demonstrates that the Data Breach has put them at immediate risk for additional harm.

97. The fraud and attempted fraud that Plaintiff and certain Class Members have suffered is sufficiently related to the Data Breach because of the time frame in which it occurred (after the Data Breach), and because the same information that was exposed in the Data Breach would have been used to effectuate the fraud and identity theft.

98. The harm already suffered by Plaintiff and Class Members demonstrates that the risk of harm to Plaintiff and Class Members is present and ongoing.

### F. It Is Reasonable for Individual Victims of Data Breaches to Expend Time and Money to Mitigate Their Risk of Harm

99. Cybercriminals can and do use the precise Personal Information that Defendant was entrusted to safeguard to perpetrate financial crimes that harm Plaintiff and Class Members.

100. The FTC recommends that identity theft victims take several steps to protect their Personal Information after a data breach, including contacting one of the three credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[75]

101. There may also be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Personal Information is stolen and when it is used. According to the GAO Report: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[76]

---

[75] *Identity Theft Recovery Steps*, FTC (https://www.identitytheft.gov/Steps) (last accessed February 11, 2026). Indeed, the FTC takes data breaches seriously and has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information can constitute an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015).

[76] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, at 29 (June 2007) (https://www.gao.gov/assets/270/262899.pdf) (last accessed February 11, 2026).

102. Theft of Personally Identifiable Information is even more serious when it includes theft of Protected Health Information. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[77]

103. Medical identity theft "is also more difficult to detect, taking almost twice as long as normal identity theft."[78] In warning consumers of the dangers of medical identity theft, the FTC states that an identity thief may use Personal Information "to get medical care, see a doctor, get prescription drugs, buy medical devices, or submit claims with your insurance provider." The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It also could hurt your credit."[79]

104. There may be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average, it takes

---

[77] *Report: Medical Identity Theft – The Information Crime that Can Kill You*, World Privacy Forum (May 3, 2006) (https://worldprivacyforum.org/posts/resource-page-medical-identity-theft/#:~:text=REPORT%20:%20Medical%20Identity%20Theft%20%2D%20The%20Information%20Crime%20that%20Can%20Kill%20You&text=This%20report%20finds%20that%20medical,theft%20while%20protecting%20patient%20privacy) (last accessed February 11, 2026).

[78] Karen Weintraub, *A game of 'cat and mouse': Hacking attacks on hospitals for patient data increase during coronavirus pandemic,* USA Today (https://www.usatoday.com/story/news/health/2020/07/12/hospitals-see-rise-patient-data-hacking-attacks-during-covid-19/5403402002/) (last accessed February 11, 2026).

[79] *Id.*

approximately three months for a consumer to discover their identity has been stolen and used and it takes some individuals up to three years to learn that information.[80]

105. A report published by the World Privacy Forum and presented at the U.S. FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services they neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs

[80] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, J. of Systemics, Cybernetics and Informatics, Vol. 17, No. 5, at 12 (2019) (http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf) (last accessed February 11, 2026).

due to incorrect information placed in their health files due to the crime, in the aftermath of the crime.

f. Data gathered in the last 5 years and data analyzed for this report sheds new facts and light on the seriousness of debt collection problems for victims. Victims can experience long term problems with aggressive medical debt collection arising from debt that does not belong to them. As a result of improper or even potentially fraudulent medical debt reporting, some victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information is an additional modality of harm.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

i. Victims still experience a general lack of ability to cure the full range of problems medical identity theft brings, even over the course of years for some victims.[81]

106. Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (e.g., donation history or hospital records), directly and

[81] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum, at 6-7 (Dec. 12, 2017) (https://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf) (last accessed February 11, 2026).

materially increase the chance that a potential victim is targeted in the future by a spear phishing attack, which often results in a high rate of identity theft, fraud, and extortion.[82]

107. Plaintiff and Class Members' stolen data will continue to be leaked and traded on the dark web, meaning Plaintiff and Class Members will remain at an increased risk of fraud and identity theft for many years into the future. Indeed, some Class Members are in the very early stages of their lives—in their twenties and thirties. Thus, as the respective Data Breach Notices advise, customers, including Plaintiff and Class Members, must vigilantly monitor their financial accounts for many years to come.

### G. Damages Can Compensate Victims for the Harm Caused by the Data Breach

108. Defendant has refused to provide adequate compensation for Plaintiff and Class Members' injuries.

[82] *See, e.g.,* Jessica Davis, *Blackbaud Confirms Hackers Stole Some SSNs, as Lawsuits Increase,* TechTarget and Informa Tech's Digital Businesses Combine (Sept. 30, 2020) (https://www.techtarget.com/healthtechsecurity/news/366595050/Blackbaud-Confirms-Hackers-Stole-Some-SSNs-as-Lawsuits-Increase#:~:text=%E2%80%9CPersonal%20information%20with%20this%20level,%2C%20donations%20or%20other%20payments.%E2%80%9D) (last accessed February 11, 2026) (concluding that personal information "in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware"). *See also Attorney General Nessel Reminds Consumers to Watch For Phishing Scams Following Blackbaud Security Breach*, Mich. Dep't of Attorney General (Sept. 18, 2020) (last accessed February 11, 2026) (noting the accessed personal information "generally included names, titles, telephone numbers, email addresses, mailing addresses, dates of birth and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests and other donor profile information.").

109. The Personal Information exposed in the Data Breach has real value, as explained above. Plaintiff and Class Members have therefore been deprived of their rights to control that property and have lost the value they might otherwise have incurred from that data.[83]

110. Plaintiff and Class Members have already spent significant time monitoring their accounts, changing login credentials, and recovering from the inevitable fraud and identity theft which will occur, which deserves to be compensated. Defendant has not made compensation or other remedies available for these very real injuries.[84]

111. Defendant has offered no compensation for the aggravation, agitation, anxiety, and emotional distress that Plaintiff and Class Members have suffered, and will continue to suffer, as a result of the Data Breach. The knowledge that their information is out in the open, available for sale and exploitation at any time in the future, is real harm that also deserves compensation.

112. Plaintiff and Class Members were also deprived of the benefit of their bargain when they interacted with Defendant. Defendant had a duty to take reasonable steps to protect the Personal Information of the individuals whose information was entrusted to them and those individuals entrusted that information in exchange for

[83] Ravi Sen, *Here's How Much Your Personal Information Is Worth to Cybercriminals – and What They Do with It*, PBS News (May 14, 2021) (https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it) (last accessed February 11, 2026).

[84] Time spent monitoring accounts is another common and cognizable, compensated harm in data breach cases. *See, e.g., Equifax Data Breach Settlement*, FTC (https://www.equifaxbreachsettlement.com/) (last visited February 11, 2026).

Defendant taking on that duty. This duty was inherent in the relationships between Plaintiff and Class Members and Defendant, whether through express contractual terms, implied contractual terms, bailment, or statutory or implied duties of good faith and fair dealing.

113. Defendant has not taken sufficient steps or even attempted to make Plaintiff and Class Members whole. Defendant has failed in its duty to protect Plaintiff and Class Members' Personal Information and has failed in its duty to help these consumers protect themselves in the future.

### H. Defendant Breached Its Duty to Protect Plaintiff and Class Members' Private Information

114. Defendant's cybersecurity practices and policies were inadequate and fell short of the industry standard measures that should have been implemented long before the Data Breach occurred.

115. However, because Defendant markets and advertises itself as securely handling highly sensitive Personal Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for:

a. adequately designing, maintaining, and updating its software and networks;

b. promptly detecting, remediating, and notifying its customers of any critical vulnerabilities in their software and networks;

c. ensuring compliance with industry standards related to data security;

d. ensuring compliance with regulatory requirements related to data security;

e. protecting and securing the Personal Information stored on its networks from unauthorized disclosure; and

f. providing adequate notice to customers and individuals if their Personal Information is disclosed without authorization.

116. Defendant failed to use the requisite degree of care that a reasonably prudent company would use in designing, developing, and maintaining networks that store highly sensitive Personal Information.

117. Defendant should have implemented industry standard security protocols to mitigate the risk of a Data Breach.

118. In addition to mitigating the risk of stolen credentials, the Cybersecurity and Infrastructure Security Agency (CISA) guidance encourages organizations to prevent unauthorized access by:

a. adequately designing, maintaining, and updating their software and networks;

b. promptly detecting, remediating, and notifying their customers of any critical vulnerabilities in their software and networks;

c. ensuring compliance with industry standards related to data security;

d. ensuring compliance with regulatory requirements related to data security;

e. protecting and securing the Personal Information stored on their networks from unauthorized disclosure; and

f. providing adequate notice to customers and individuals if their Personal Information is disclosed without authorization.

119. The CISA guidance further recommends use of centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment. Likewise, the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.

120. Not only should Defendant have had measures like these in place to prevent compromise in the first place, Defendant should have also properly siloed its systems so that a bad actor would be unable to escalate privileges and move laterally through Defendant's systems.

121. Defendant's lack of segmented systems, which are common to cloud-based servers, allowed the hacker to travel among Defendant's systems freely, compromising multiple systems which Defendant was unable to recover.

122. CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.

123. Despite being entrusted to protect the Personal Information of millions of patients and policyholders, Defendant failed to adhere to these recommended best practices. Had Defendant implemented common sense security measures, the hackers

never could have accessed millions of patient files, and the Data Breach would have been prevented or been much smaller in scope. Defendant also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

124. Defendant, like any entity its size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to more than a million patient files. Defendant's below-industry-standard procedures and policies are inexcusable given its knowledge that it was a prime target for cyberattacks.

125. Defendant's failure to follow industry standard cybersecurity protocols directly resulted in the Data Breach and the compromise of Plaintiff and Class Members' Personal Information.

## I. Defendant Failed to Follow Industry Standards for Data Security

126. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[85]

127. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should identify the personal information that they keep;

[85] *Start with Security: A Guide for Business*, *Lessons Learned from FTC Cases,* FTC, at 2 (June 2015) (https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) (last accessed February 11, 2026).

properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct any security problems.[86]

128. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[87]

129. The FTC further recommends that companies not maintain Personal Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[88]

130. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act

---

[86] *Protecting Personal Information: A Guide for Business,* FTC (Oct. 2016) (https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) (last accessed February 11, 2026).

[87] *Id.* at 21-22.

[88] *Id.* at 5, 6, 13, 21, 26.

("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.[89]

131. Defendant was fully aware of its obligation to implement and use reasonable measures to protect the Personal Information of its policyholders but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendant's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### J. Defendant Failed to Comply with its HIPAA Obligations

132. As an entity that receives health information, Defendant is a "business associate" that is required to comply with the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[90]

133. These rules establish national standards for the protection of patient information, including personal health information, defined as "individually identifiable health information" which "identifies the individual" or involves a "reasonable basis to believe the information can be used to identify the individual."[91]

[89] *Privacy and Security Enforcement*, FTC (https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement) (last accessed February 11, 2026).

[90] *See* 45 C.F.R. § 160.102, *et seq.* (HIPPA provisions); 45 C.F.R. §§ 160.103 (defining business associates and noting application of provisions to business associates); 42 U.S.C. §§ 17931, 17932, 17934 (applying provisions to business associates).

[91] 45 C.F.R. § 160.103.

134. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[92]

135. HIPAA requires that Defendant implement appropriate safeguards for this information,[93] including administrative, physical, and technical safeguards.[94]

136. HIPAA requires that Defendant provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e., non-encrypted data.[95]

137. HIPAA further requires covered entities to "[i]mplement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed."[96]

138. HIPAA security standards require organizations to "[p]rotect against any reasonably anticipated threats or hazards to the security or integrity of such information."[97] Automatically tracking Indicators of Compromise ("IoCs") is a recommended practice.[98]

139. It is also recommended to use an Intrusion Prevention System (IPS), and in order "[t]o stay up to date, IPS should leverage a Structure Threat Information eXpression

---

[92] 45 C.F.R. § 164.502.
[93] 45 C.F.R. § 164.530(c).
[94] 45 C.F.R. §§ 164.308, 310, 312.
[95] 45 C.F.R. §§ 164.402, 404.
[96] 45 C.F.R. § 164.312(d).
[97] 45 C.F.R. § 164.306(a)(2).
[98] Robert Brzezinski, *HIPAA Privacy and Security Compliance - Simplified: Practical Guide for Small and Medium Organizations* 28 (2016 ed.).

(STIX)/Trusted Automated eXchange of Indicator Information (TAXII) feed to obtain IOC from an Information Sharing and Analysis Center (ISAC) or similar source."[99]

140. Having systems in place to configure alerts for IoCs is also recommended.[100]

141. As evidenced by the Data Breach, Defendant did not track IoCs.

142. Despite the requirements under HIPAA for data security, Defendant failed to comply with its duties under HIPAA and its own privacy policies by failing to:

a. Maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b. Adequately protect the Personal Information of policyholders;

c. Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

---

[99] *Technical Vol. 2: Cybersecurity Practices for Medium and Large Healthcare Organizations,* Healthcare & Public Health Sector Coordinating Council, U.S. Dep't of Health & Human Services, at 66 (2023) (https://405d.hhs.gov/Documents/tech-vol2-508.pdf) (last accessed February 11, 2026).

[100] *SecurityMetrics Guide to HIPAA Compliance*, SecurityMetrics (10th ed. 2023) (https://cdn.prod.website-files.com/672e4d78ddc6417dc8ab2e1f/678aca9da4ef880eb768ddc8_SecurityMetrics-Guide-to-HIPAA-Compliance-Tenth-Edition.pdf) (last accessed February 11, 2026).

e. Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Implement adequate procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted or required under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. Ensure compliance with the electronically protected health information security standard rules by its workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. Train all members of its workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

143. The NIST also recommends removing, masking, encrypting, or hashing Personally Identifiable Information contained in company datasets:

> There are many possible processes for removing direct identifiers from a dataset. Columns in a dataset that contain a direct identifier can be removed. In masking, the direct identifier is transformed into a repeating character, such as XXXXXX or 999999. Identifiers can be encrypted or hashed so that the linked records remain linked. In the case of encryption or hashing, algorithms are employed that require the use of a key, including the Advanced Encryption Standard or a Hash-based Message Authentication Code. Implementations may use the same key for all identifiers or use a different key for each identifier. Using a different key for each identifier provides a higher degree of security and privacy. Identifiers can alternatively be replaced with a keyword, including transforming "George Washington" to "PATIENT" or replacing it with a surrogate value, such as transforming "George Washington" to "Abraham Polk."[101]

144. Given that the attackers were able to access Personal Information simply by logging in, it is clear that Defendant did not protect Plaintiff and Class Members' Personal Information with sufficient masking, encrypting, or hashing.

145. Defendant was fully aware of its obligations to implement and use reasonable measures to protect the Personal Information of patients but failed to comply with these basic recommendations and guidelines that would have prevented this Data Breach from occurring. Defendant's failure to employ reasonable measures to protect against unauthorized access to patient Personal Information violated HIPAA and constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### K. Plaintiff and Class Members Suffered Damages

---

[101] *NIST Special Publication 800-53 Rev. 5, SI-19(4): Removal, Masking, Encryption, Hashing, or Replacement of Direct Identifiers*, *Supplemental Guidance*, NIST (Sept. 2020) (https://csf.tools/reference/nist-sp-800-53/r5/si/si-19/si-19-4/#:~:text=Supplemental%20Guidance,%22%20to%20%22Abraham%20Polk.%22) (last accessed February 11, 2026).

146. Defendant received Plaintiff and Class Members' Private Information in connection with financial services to them. In requesting and maintaining Plaintiff and Class Members' Private Information for business purposes, Defendant expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff and Class Members' Private Information. Defendant did not, however, take proper care of Plaintiff and Class Members' Private Information, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendant's inadequate security measures.

147. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive accounts even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them. Plaintiff and Class Members have taken or will be forced to take these measures in order to mitigate their potential damages as a result of the Data Breach.

148. Once Personal Information is exposed, there is little that can be done to ensure that the exposed information has been fully recovered or protected against future

misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct.

149. Further, the value of Plaintiff and Class Members' Private Information has been diminished by its exposure resulting from the Data Breach. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for financial services; they instead received services that were of a diminished value to those described in their agreements with Defendant for the benefit and protection of Plaintiff and Class Members and their respective Private Information. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they received.

150. Plaintiff and Class Members would not have obtained services from Defendant or paid the amount they did to receive such services had they known that Defendant would negligently fail to protect their Private Information. Indeed, Plaintiff and Class Members paid for services with the expectation that Defendant would keep their Private Information secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from Defendant had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their Personal Information from criminal theft and misuse.

151. As a result of Defendant's failures, Plaintiff and Class Members are also at a substantial and certainly impending increased risk of suffering identity theft and fraud or other misuse of their Personal Information.

152. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud.[102]

153. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's computer systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its consumers' Personal Information.

154. In addition, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial and/or medical fraud, and the unauthorized exposure of their private information to strangers.

## V. CLASS ALLEGATIONS

155. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following nationwide class (the "Class") and California subclass, defined as:

---

[102] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud) (last accesse
d February 11, 2026).

> **Nationwide Class:** All residents of the United States whose Personal Information was compromised due to the Data Breach.
>
> **Ohio Subclass:** All residents of Ohio whose Personal Information was compromised due to the Data Breach.

156. Excluded from the Class is Defendant, any entity in which a Defendant has a controlling interest, any of the officers or directors of Defendant, the legal representatives, heirs, successors, and assigns of Defendant, and any Judge to whom this case is assigned, and his or her immediate family.

157. The definition of the Class may be further modified or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

158. **Numerosity and Ascertainability:** Plaintiff does not know the exact size of the Class or the identity of the Class Members because such information is in the exclusive control of Defendant. Nevertheless, based on published reports, the Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will benefit the parties and the Court. The names, phone numbers, and addresses of Class Members are identifiable through documents maintained by Defendant.

159. **Commonality and Predominance:** This action involves common questions of law and fact as to all members of the class, which predominate over any question solely affecting individual Class Members. Common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a legal duty to use reasonable security measures to protect Plaintiff and Class Members' Personal

Information;

c. Whether Defendant's failure to implement effective security measures to protect Class Member Private Information was negligent;

d. Whether Plaintiff and Class Members are entitled to injunctive relief;

e. Whether Plaintiff and Class Members are entitled to declaratory relief; and

f. Whether, as a result of Defendant's conduct, Plaintiff and the Class are entitled to damages and equitable relief.

160. **Typicality:** Plaintiff's claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct described above. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other members of the Class that she seeks to represent, and there are no defenses that are unique to Plaintiff. Plaintiff and Class Member claims and injuries arise from the same facts and are based on the same law.

161. **Adequacy:** Plaintiff is an adequate Class Representative because her interests do not conflict with the interests of other Class Members she seeks to represent; Plaintiff has retained competent counsel that is experienced in complex class action litigation; and Plaintiff intends to vigorously prosecute this action. The interests of Class Members will be fairly and adequately protected by Plaintiff and her counsel.

162. **Superiority:** A class action is superior to other available methods for fair and efficient adjudication of this controversy. No unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Class

Members are relatively small compared to the expense required to individually litigate their claims against Defendant, so, absent class-wide adjudication, it would be virtually impossible for Class Members to seek individual redress against Defendant's wrongful conduct.

## VI. CAUSES OF ACTION

**COUNT ONE**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

163. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

164. As part of its business, Defendant solicited, collected, and maintained Plaintiff and Class Members' Personal Information.

165. Defendant's business depended upon collecting Plaintiff and Class Members' Personal Information because the financial services and products they provide requires the use and maintenance of Plaintiff and Class Members' Personal Information.

166. Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risks of harm to Plaintiff and Class Members collecting, employing, maintaining, storing, and managing Personal Information.

167. Upon collecting, accepting custody of, and storing Plaintiff and Class Members' Personal Information, Defendant undertook and owed a duty to Plaintiff and the Class to safeguard and protect their Personal Information using reliable, proven, effective, and safe methods for doing so.

168. Defendant was fully aware that Plaintiff and Class Members' Personal Information was sensitive, that Plaintiff and Class Members would suffer extensive and myriad injuries if their Personal Information was wrongfully disclosed, and that providing sufficient security for the collected Personal Information was of critical importance.

169. Plaintiff and Class Members were foreseeable victims of any insufficient security protocols and practices by Allianz. Allianz had a duty of care to not subject Plaintiff and Class Members to an unreasonable risk of injury. Defendant knew that cyber criminals frequently use cyberattacks to steal sensitive Personal Information and exploit it for financial gain to the substantial detriment of the individuals to whom the Personal Information pertains.

170. Defendant's duty to Plaintiff and Class Members extended to protecting them from the foreseeable risk of third parties' criminal conduct.

171. Defendant's duties to Plaintiff and Class Members also included:

a. using reasonable and adequate technology and security procedures to promptly detect security incidents, data breaches, or unauthorized access into servers, email systems, and company networks;

b. safeguarding Plaintiff and Class Members' Personal Information by employing adequate and reasonable security practices and technology; and

c. using reasonable care in creating, integrating, maintaining, and testing Defendant's email accounts, networks, third-party CRM providers, policies and procedures, employee trainings, and security protocols,

to ensure that Plaintiff and Class Members' Personal Information was safe and reasonably secure from theft, publication, or disclosure.

172. Only Allianz was capable of securing its own systems and programs and making sure that the security measures employed were sufficient to safeguard Plaintiff and Class Members' Personal Information.

173. Allianz breached its duty of care because it failed to adequately safeguard the Personal Information belonging to Plaintiff and Class Members. Defendant's breaches included, but were not limited to:

a. Failing to adequately train and test its employees on sufficiently and safely sending and storing Personal Information;

b. Failing to reasonably implement protocols for promptly detecting security incidents, data breaches, or unauthorized access to sensitive data, including Plaintiff and Class Members' Personal Information;

c. Failing to use adequate and reasonable security systems and policies for safeguarding the Personal Information it possessed;

d. Failing to train its employees to avoid phishing emails and test employees' conduct upon receipt of suspicious emails;

e. Failing to enforce security policies for protecting Plaintiff and Class Members' Personal Information;

f. Failing to use reasonable and adequate industry standard security systems and devices for emails, including SPAM filters, DMARC compliance, and/or Sender Policy Framework compliance;

g. Failing to ensure that Allianz did not maintain or keep Personal Information on its systems, servers, and devices for longer than necessary;

h. Failing to use reasonable care in protecting, maintaining, using, and erasing the Personal Information that Allianz possessed.

174. Allianz's failure to fulfill these duties was reckless, grossly negligent, and wrongful considering the foreseeable and substantial risks that such a failure would entail.

175. Plaintiff and Class Members have already suffered injuries and are at imminent risk of additional injuries as a foreseeable and proximate result of Defendant's negligence.

176. Plaintiff and Class Members' Personal Information has been publicly exposed as a direct result of Defendant's breach of its duty to use reasonable care to adequately protect and secure Plaintiff and Class Members' Personal Information.

177. Plaintiff and Class Members have suffered and will continue to suffer damages which are the direct and proximate result of Defendant's negligent conduct. These damages include but are not limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The

unauthorized acquisition of Plaintiff and Class Members' Personal Information has also diminished the value of their Personal Information.

178. Defendant's wrongful acts and omissions constituted and continue to constitute common law negligence.

179. Plaintiff and Class Members are accordingly entitled to damages in an amount to be proven at trial.

## COUNT TWO
## NEGLIGENCE PER SE
## (On Behalf of Plaintiff and the Nationwide Class)

180. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

181. The FTC Act prohibits "unfair practices in or affecting commerce."[103] It imposed and continues to impose on Defendant a duty to Plaintiff and Class Members to provide adequate and fair practices, computer systems, and data security for safeguarding Plaintiff and Class Members' Personal Information. In enforcement actions, the FTC has treated businesses' failure to employ reasonable measures to adequately secure consumer's confidential data as an unfair act or practice prohibited by Section 5 of the FTC Act.[104]

---

[103] 15 U.S.C. § 45(a).

[104] *See, e.g.*, Complaint, *Drizly, LLC and James Cory Rellas*, FTC Matter No. 2023185 (Oct. 24, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/202-3185-Drizly-Complaint.pdf (last visited July 16, 2025); Complaint, *Fandango*, FTC Matter No. 1323089 (Aug. 19 2014), https://www.ftc.gov/system/files/documents/cases/140819fandangocmpt.pdf (last visited July 16, 2025).

182. Defendant's failure to use reasonable and appropriate methods to guard Plaintiff and Class Members' Personal Information against unauthorized access is an unfair act or practice that Section 5 of the FTC Act prohibits.

183. Defendant violated the FTC Act by failing to comply with industry-standard data security practices, as described above.

184. Defendant's collection and maintenance of Plaintiff and Class Members' Personal Information were actions central to its business and affected commerce.

185. The class of people that the FTC Act is intended to protect include Plaintiff and Class Members.

186. The injuries that Plaintiff and Class Members suffered and continue to suffer and that resulted from the data breach are the types of injuries that the FTC Act was intended to prevent.

187. As a direct and proximate result of Defendant's negligence and violations of the FTC Act and the Unfair Competition Law ("UCL") Plaintiff and Class Members have suffered and will continue to suffer injury, which include but are not limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiff and Class Members' Personal Information has also diminished the value of their Personal Information.

188. Plaintiff and the Class are accordingly entitled to damages in amounts to be proven at trial.

**COUNT THREE**
**GROSS NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

189. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

190. Plaintiff and Class Members entrusted Allianz with highly-sensitive and inherently personal private data subject to laws on confidentiality and unfair trade practices.

191. In collecting, obtaining and storing Plaintiff and Class Members' Personal Information, Allianz owed a duty of reasonable care in safeguarding the Personal Information.

192. Allianz's networks, systems, protocols, policies, procedures and practices were not adequately designed, implemented, maintained, monitored, and tested to ensure that Plaintiff and Class Members' Personal Information were secured from unauthorized access.

193. Allianz's networks, systems, protocols, policies, procedures and practices were not reasonable given the sensitivity of the Plaintiff and Class Members' private data.

194. Allianz did not comply with state and federal laws and rules concerning the use of safekeeping of this private data.

195. Despite knowing its networks, systems, protocols, policies, procedures, and practices, as described above, were not adequately designed, implemented, maintained,

monitored, and tested to ensure that Plaintiff and Class Members' Personal Information were secured from unauthorized access, Allianz ignored the inadequacies and was oblivious to the risk of unauthorized access it had created.

196. Allianz's behavior establishes facts evidencing a reckless disregard for Plaintiff and Class Members' rights.

197. Allianz was, therefore, grossly negligent.

198. Allianz's negligence is directly linked to Plaintiff and Class Members' injuries. As a result of Allianz's reckless disregard for Plaintiff and Class Members' rights by failing to secure their Personal Information, despite knowing its networks, systems, protocols, policies, procedures, and practices were not adequately designed, implemented, maintained, monitored, and tested, Plaintiff and Class Members suffered injury, which includes but is not limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiff and Class Members' Personal Information has also diminished the value of their Personal Information.

199. The harm to Plaintiff and the Class Members was a proximate, reasonably foreseeable result of Allianz's breaches of the applicable laws and regulations.

200. Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT FOUR**
**BREACH OF IMPLIED CONTRACTS**
**(On Behalf of Plaintiff and the Nationwide Class)**

201. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

202. Plaintiff and Class Members provided their Personal Information to Allianz in order to obtain financial products and services such as life insurance and annuities.

203. By providing their Personal Information, and upon Allianz's acceptance of such information, Plaintiff and Class Members on one hand, and Defendant on the other hand, entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the services provided, whereby Allianz was obligated to take reasonable steps to secure and safeguard that information.

204. Allianz had an implied duty of good faith to ensure that the Personal Information of Plaintiff and Class Members in its possession was only used in accordance with its contractual obligations.

205. Defendant was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff and Class Members' Personal Information and to comply with industry standards and state laws and

regulations for the security of this information, and Allianz expressly assented to these terms in its Privacy Policy.[105]

206. Plaintiff and Class Members performed all conditions, covenants, obligations, and promises owed to Defendant, including paying for the services provided by Defendant and/or providing the Personal Information required by Defendant.

207. Allianz breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiff and Class Members' Personal Information, resulting in the Data Breach. Allianz unreasonably interfered with the contract benefits owed to Plaintiff and Class Members.

208. Further, on information and belief, Allianz has not yet provided Data Breach notifications to some affected Class Members who may already by victims of identity fraud or theft, or are at imminent risk of becoming victims of identity theft or fraud, associated with the Personal Information that they provided to Allianz. These Class Members are unaware of the potential source for the compromise of their Personal Information.

209. The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

210. As a result of Allianz's conduct, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services that were of a diminished value

[105] "To protect your personal information from unauthorized access and use, we use security measures that comply with federal and state law." Allianz, *Privacy Notice Allianz Life of North America* (July 2024) https://www.allianzlife.com/-/media/Files/Global/documents/2016/05/09/17/32/M40018.pdf (last visited July 30, 2025).

as compared to the secure services they paid for. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in the value of the secure services they paid for and the services they received.

211. Neither Plaintiff, nor Class Members, nor any reasonable person would have provided their Personal Information to Allianz had it disclosed that its security was inadequate or that it did not adhere to industry-standard security measures.

212. As a result of Defendant's breach, Plaintiff and the Class Members have suffered actual damages resulting from theft of their Personal Information, as well as the loss of control of their Personal Information, and remain in imminent risk of suffering additional damages in the future.

213. As a result of Defendant's breach, Plaintiff and the Class Members have suffered actual damages resulting from their attempt to mitigate the effect of the breach of implied contract and subsequent Data Breach, including, but not limited to, taking steps to protect themselves from the loss of their Personal Information. As a result, Plaintiff and the Class Members have suffered actual identity theft and the inability to control their Personal Information.

214. Accordingly, Plaintiff and Class Members have been injured as a result of Allianz's breach of implied contracts and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT FIVE
## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
**(On Behalf of Plaintiff and the Nationwide Class)**

215. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

216. Plaintiff and Class Members were the intended beneficiaries of contracts with Defendant.

217. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations—both explicit and fairly implied—and would not impair the rights of the other parties to receive their rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendant would act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiff and Class Members' Personal Information and to comply with industry standards and federal and state laws and regulations for the security of this information.

218. Defendant entered into special relationships with Plaintiff and Class Members, who entrusted their confidential Personal Information to Defendant.

219. Defendant promised and was obligated to protect the confidentiality of Plaintiff and Class Members' Personal Information from disclosure to unauthorized third parties. Defendant breached the covenant of good faith and fair dealing by failing to take adequate measures to protect the confidentiality of Plaintiff and Class Members' Personal Information, which resulted in the Data Breach. Defendant unreasonably interfered with the contract benefits owed to Plaintiff and Class Members by failing to implement reasonable and adequate security measures consistent with industry standards to protect

and limit access to the Personal Information of Plaintiff and the Class in Defendant's possession.

220. Plaintiff and Class Members performed all conditions, covenants, obligations, and promises owed to Defendant, including paying for the services they received and entrusting Defendant with the confidential Personal Information.

221. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members did not receive the full benefit of their bargain—services with reasonable data privacy—and instead received services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts. Plaintiff and Class Members have suffered actual damages in an amount equal to the difference in the value between services with reasonable data privacy that Plaintiff and Class Members paid for, and the services they received without reasonable data privacy.

222. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

223. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the Data Breach, including, but not limited to, taking steps to protect themselves from the loss of their Personal Information.

224. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered injury in fact and are therefore entitled to relief, including restitution, declaratory relief, and a permanent injunction enjoining Defendant from its conduct. Plaintiff also seeks reasonable attorneys' fees and costs under applicable law.

**COUNT SIX**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

225. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

226. Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monetary payments—directly or indirectly—for services.

227. Allianz collected, maintained, and stored the Personal Information of Plaintiff and Class Members and, as such, Defendant had knowledge of the monetary benefits conferred by Plaintiff and Class Members. The collection, maintenance, and storage of Plaintiff and Class Members' Personal Information was a central part of Allianz's business and ability to gain profits.

228. The money that Defendant directly or indirectly received from Plaintiff and Class Members should have been used to pay, at least in part, for the administrative costs and implementation of data management and security. Defendant failed to implement—or adequately implement—practices, procedures, and programs to secure sensitive Personal Information, as evidenced by the Data Breach.

229. As a result of Defendant's failure to implement security practices, procedures, and programs to secure sensitive Personal Information, Plaintiff and Class

Members suffered actual damages in an amount equal to the difference in the value between services with reasonable data privacy that Plaintiff and Class Members paid for, and the services they received without reasonable data privacy.

230. Under principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members because Defendant failed to implement the data management and security measures that are mandated by industry standards and that Plaintiff and Class Members paid for.

231. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendant. A constructive trust should be imposed upon all unlawful and inequitable sums received by Defendant traceable to Plaintiff and the Class.

## COUNT SEVEN
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Nationwide Class)

232. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

233. Plaintiff and the Class have stated claims against Defendant based on negligence, negligence per se, gross negligence, breach of implied contracts, breach of implied duty of good faith and fair dealing, and unjust enrichment.

234. Defendant failed to fulfill its obligations to provide adequate and reasonable security measures for the Personal Information of Plaintiff and the Class, as evidenced by the Data Breach.

235. As a result of the Data Breach, Defendant's system is more vulnerable to unauthorized access and requires more stringent measures to be taken to safeguard the Personal Information of Plaintiff and the Class going forward.

236. Plaintiff seeks a declaration that Defendant must implement specific additional, prudent industry security practices to provide reasonable protection and security to the Personal Information of Plaintiff and the Class. Specifically, Plaintiff and the Class seek a declaration that Defendant's existing security measures do not comply with its obligations, and that Defendant must implement and maintain reasonable security measures on behalf of Plaintiff and the Class to comply with its data security obligations.

**COUNT EIGHT**
**OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code § 1345.01, *et seq*. ("CSPA")**
**(On Behalf of Plaintiff and the Ohio Subclass)**

237. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

238. Plaintiff and the Ohio Subclass Members are "consumers" within the meaning of the CSPA. Ohio Rev. Code § 1345.01(D).

239. Defendant is a "supplier" within the meaning of the CSPA. Ohio Rev. Code § 1345.01(C).

240. Plaintiff and the Ohio Subclass Members and Defendant entered into "consumer transactions" within the meaning of the CSPA primarily for persona, family, or household purposes by providing the service of collecting, retaining, and protecting

Plaintiff and the Ohio Subclass Members' Personal Information. Ohio Rev. Code § 1345.01(A).

241. By collecting, retaining, and protecting Plaintiff and the Ohio Subclass Members' Personal Information, Defendant was acting outside of its capacity as an insurer.

242. The CSPA states, "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code § 1345.02.

243. Defendant's conduct violated the following provisions of the CSPA:

a. Ohio Revised Code section 1345.02(B)(1), by knowingly, recklessly, and/or intentionally representing its services as having performance characteristics, uses, or benefits that they did not have; and

b. Ohio Revised Code section 1345.02(B)(1), by knowingly, recklessly, and/or intentionally representing its services as being of a particular standard, quality, grade that it is not.

244. More specifically, Defendant engaged in unfair or deceptive acts or practices in or affecting commerce in violation of the CSPA, including:

a. Failing to implement and maintain reasonable and appropriate data security practices to protect against the unauthorized access of Plaintiff's and the Ohio Subclass Members' Personal Information;

b. Misrepresenting and advertising that it was "committed to the highest standards of data protection and privacy compliance by handling personal

data responsibly, transparently, with due care and in a fair and lawful manner;"

c. Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures, despite knowing the risk of cybersecurity incidents and the risks of identity theft and fraud against individuals whose PII has been compromised;

d. Failing to comply with reasonable data security measures that did not comport with its own policies, expert recommendations, industry standards, and statutory and common law requirements for reasonable data security;

e. Omitting, suppressing, and concealing the material fact that it did not properly secure Plaintiff's and the Ohio Subclass Members' Personal Information; and

f. Omitting, suppressing, and concealing the material fact that it failed to comply with reasonable data security measures that did not comport with expert recommendations, industry standards, and statutory and common law requirements for reasonable data security.

245. Defendant's representations and omissions were material in that Plaintiff and the Ohio Subclass Members would have considered them when deciding whether to engage with Defendant or otherwise purchase its services. Had Plaintiff and the Ohio Subclass Members known Defendant did not have reasonable and appropriate data security measures, they would not have engaged with or purchased Defendant's services or paid the price they did.

246. Defendant's representations and omissions were likely to deceive reasonable consumers about the adequacy of its data security policies and practices and ability to protect the confidentiality of consumers' Private Information.

247. Defendant intended to mislead Plaintiff and the Ohio Subclass Members and induce them to rely on its misrepresentations and omissions.

248. Plaintiff and the Ohio Subclass Members entrusted their Personal Information to Defendant with the reasonable expectation that Defendant would comply with its obligations to maintain the confidentiality of such information and secure from unauthorized access.

249. Plaintiff and the Ohio Subclass Members did, indeed, rely on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

250. Defendant collected and stored Plaintiff's and the Subclass Members' Personal Information. Defendant knew or should have known it stored the Personal Information in an unsafe or unsecured manner by failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data in an unsecured database in an unencrypted format, failing to adequately monitor activities on the servers containing Plaintiff's and the Ohio Subclass Members' Personal Information, and failing to adequately segment the sensitive data from other parts of Defendant's servers and networks.

251. Defendant acted intentionally, knowingly, and maliciously to violate the CSPA and recklessly disregarded Plaintiff's and the Ohio Subclass Members' rights.

252. Defendant's failure to comply with basic data security practices necessary to protect any stored data, including Plaintiff's and the Ohio Subclass Members' highly

private Personal Information, constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to Plaintiff and the Ohio Subclass. That is especially true because, despite failing to reasonably protect Plaintiff's and the Ohio Subclass Members' highly sensitive and private Personal Information, Defendant gained significant profit from that information. Indeed, a significant part of Defendant's revenue was the use, analysis, and sale of data related to the Plaintiff's and the Ohio Subclass Members' Personal Information. While Defendant profited from Plaintiff's and the Ohio Subclass Members' data, it failed to take the necessary measures to protect it, leaving Plaintiff and the Ohio Subclass Members at significant and foreseeable risk of harm.

253. As a result of those unlawful and unfair business practices, Plaintiff and the Ohio Subclass Members' highly sensitive Personal Information was at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach, where hackers obtained and successfully exfiltrated the Personal Information of Plaintiff and the Ohio Subclass Members. Subsequently, the stolen information was posted on the dark web, exposing their private and personal information and putting them at a substantial risk their data would be misused.

254. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiff and the Ohio Subclass Members suffered significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity, name and likeness; (3) fraud and identity theft from the misuse of their stolen Personal Information; (4) diminution in the value of their Personal Information due to the loss of security, confidentiality, and privacy; (5) emotional and mental distress and anguish

resulting from the access, theft and posting of their Personal Information; (6) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (7) a continued substantial and imminent risk of the misuse of their Personal Information.

255. Plaintiff and the Ohio Subclass Members seek all monetary and non-monetary relief allowed by law, including any economic damages, including actual damages; treble damages; costs; statutory damages; attorneys' fees; injunctive relief; and any other relief available by law and to which the Court deems just and proper.

**COUNT NINE**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT ("MDTPA")**
**Minn. Stat. § 325D.43**
**(On Behalf of Plaintiff and the Nationwide Class)**

256. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

257. Minnesota affords a cause of action to any person harmed by an entity's use of deceptive trade practices. Minn. Stat. § 325D.45, Subd. 3.

258. Under the MDTPA, a "person engages in a deceptive trade practice when, in the course of business, vocation or occupation, the person . . . engaged in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices[.]". Minn. Stat. § 325D.44, subd. 1(13).

259. Defendant engaged in conduct that violated the MDTPA.

260. Specifically, Defendant collected and stored Plaintiff and the Nationwide Class members' Personal Information. Defendant stored the Personal Information in a

knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Plaintiff and the Nationwide Class's information, and failing to adequately segment the sensitive data from other parts of Defendant's servers and networks.

261. Similarly, Defendant deployed knowingly unreasonable data security measures that defied expert recommendations, industry standards, and statutory requirements for reasonable data security.

262. Defendant's failure to comply with basic data security necessary to protect any stored data, much less the significant and highly private Personal Information Defendant stored, constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to Plaintiff and the Nationwide Class. That is especially true because, despite failing to reasonably protect Plaintiff and the Nationwide Class's highly sensitive and private Personal Information, Defendant gained significant profit from that information. Indeed, a significant part of Defendant's revenue was the use, analysis, and sale of data related to Plaintiff and the Class's Personal Information. While Defendant profited from Plaintiff and the Nationwide Class's data, it failed to take the necessary measures to protect it, leaving Plaintiff and the Nationwide Class at significant and foreseeable risk of harm.

263. Defendant violated the MDTPA by acting unfairly, unlawfully, and unscrupulously. Specifically, Defendant violated the MDTPA by developing the server subject to the breach, including collecting and aggregating Plaintiff and the Nationwide

Class's Personal Information and putting in place knowingly unreasonable data security to protect that Personal Information. Defendant failed to follow its own policies, which required it to put in place certain measures to protect policyholders' Personal Information. Furthermore, Defendant's systems lacked other reasonable data security measures, as demonstrated by the cybercriminals' ability to move laterally within the system.

264. As a result of those unlawful and unfair business practices, Plaintiff and the Nationwide Class's highly sensitive Personal Information was put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach, where hackers obtained and successfully exfiltrated the Personal Information of Plaintiff and the Nationwide Class. Subsequently, the stolen information was posted on the dark web, exposing their private and personal information and putting clients at a substantial risk of misuse of their data.

265. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiff suffered significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of their identity, name and likeness; (3) fraud and identity theft from the misuse of their stolen Personal Information; (4) diminution in the value of their Personal Information due to the loss of security, confidentiality, and privacy; (5) lost value of their Personal Information; (6) emotional and mental distress and anguish resulting from the access, theft and posting of their Personal Information; (7) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of their Personal Information.

266. Plaintiff and the Nationwide Class also remain at heightened risk of future injury because their information resides with Defendant and, further, because Defendant continues to gather new information on Plaintiff and the Nationwide Class. Without the use of adequate data security, Plaintiff and the Nationwide Class remain at a heightened and substantial risk that their Personal Information will be subject to another data breach.

267. Plaintiff and the Nationwide Class seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

## COUNT TEN
## VIOLATION OF MINNESOTA CONSUMER FRAUD ACT ("MCFA")
## Minn. Stat. §§ 325F.68, *et seq*.
## (On Behalf of Plaintiff and the Nationwide Class)

268. Plaintiff re-alleges and incorporates by reference paragraphs 1-162, as if fully set forth herein.

269. Defendant is a "person" as defined by Minn. Stat. § 325F.68(3).

270. Defendant's goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

271. Defendant engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

272. Defendant engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and the Nationwide Class Members' Personal Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and the Nationwide Class Members' Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, MDTPA, MCFA and MHRA, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff and the Nationwide Class Members' Personal Information, including by implementing and maintaining reasonable security measures and ensuring its vendors and business associates maintained reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and the Nationwide Class Members' Personal Information, including

duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, MDTPA, MCFA and MHRA;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff and the Nationwide Class Members' Personal Information, or ensure its vendors and business associates reasonably or adequately secured such information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and the Nationwide Class Members' Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, HIPAA, 42 U.S.C. § 1320d, MDTPA, MCFA and MHRA.

273. Defendant's misrepresentations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of consumers' Personal Information.

274. Defendant intended to mislead Plaintiff and the Nationwide Class Members and induce them to rely on their misrepresentations and omissions.

275. Defendant's fraudulent, misleading, and deceptive practices affected the public interest, including those affected by the Data Breach.

276. As a direct and proximate result of Defendant's fraudulent, misleading, and deceptive practices, Plaintiff and the Nationwide Class Members have suffered and will

continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

277. Plaintiff and the Nationwide Class Members seek all monetary and non-monetary relief allowed by law, including damages; injunctive or other equitable relief; and attorneys' fees, disbursements, and costs.

## VII. PRAYER FOR RELIEF

Plaintiff, on behalf of himself and on behalf of the proposed Classes, requests that the Court:

a. Certify this case as a class action and appoint Plaintiff as class representative;

b. Find that Allianz breached its duties to safeguard and protect the Personal Information of Plaintiff and Class Members that was compromised in the Data Breach;

c. Award Plaintiff and Class Members appropriate relief, including actual and statutory damages, restitution and disgorgement;

d. Award equitable, injunctive and declaratory relief as may be appropriate;

e. Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f. Award pre-judgment and post-judgment interest as prescribed by law; and

g. Grant additional legal or equitable relief as this Court may find just and proper.

## VIII. JURY TRIAL DEMAND

A jury trial is demanded by Plaintiff on all claims so triable.

Dated: February 25, 2026

*s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
Shashi K. Gowda (#401809)
Frances Mahoney-Mosedale (#402741)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
sgowda@gustafsongluek.com
fmahoneymosedale@gustafsongluek.com

*Attorneys for Plaintiff and the Proposed Class*